# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of February __, 2019 (this "*Agreement*") and is entered into by and among REGISTER COMMUNICATIONS, INC., a Georgia corporation ("*Register*"), its wholly-owned licensee subsidiaries, RADIO PERRY, INC., Debtor-in-Possession, a Georgia corporation ("*Radio Perry*"), RADIO PEACH, INC., Debtor-in-Possession a Georgia corporation ("*Radio Peach*") and LOWELL L. REGISTER, a Georgia resident, ("*L.R.*" and collectively with Register, Radio Perry, and Radio Peach, the "*Seller*"), and Ventura Media Communications LLC,  an Idaho Limited Liability Company  ("*Buyer*").

## RECITALS

**WHEREAS**, Radio Perry is the licensee of broadcast television station WPGA-TV, channel 32, Perry, Georgia, Facility ID No. 54728 ("*WPGA-TV)*; and Radio Peach is the licensee of low power television station WPGA-LP, channel 50, Macon, Georgia, Facility ID No. 67972 ("*WPGA-LP*" and, collectively with WPGA-TV, the "*Business*"), pursuant to authorizations (the "*FCC Authorizations*") issued by the Federal Communications Commission (the "*FCC*");

**WHEREAS**, L.R. is the owner of that certain real property and improvements thereon located in Twiggs County, Georgia as more particularly described in Schedule 2.2(c) attached hereto (the "*Twiggs County Property*");

**WHEREAS**, Seller desires to sell and Buyer desires to acquire substantially all of the assets owned or leased by Seller and used or useful in connection with the operation of the Business, including the Twiggs County Property.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For the purpose of this Agreement, capitalized terms used herein but not otherwise defined herein have the meanings as set forth on Schedule 1 attached hereto and incorporated herein by reference.

## ARTICLE II
## THE ACQUISITION

**Section 2.1**     **The Acquisition.** At the Closing (as defined in Section 3.1), and upon and subject to the terms and conditions of this Agreement, the parties mutually covenant and agree as follows:

(a)      Seller will sell, convey and assign to Buyer all right, title and interest in and to the Acquired Assets (as defined in Section 2.2) free and clear of all liens, pledges, security interests, charges, restrictions or encumbrances of any nature whatsoever; and

(b)      Buyer will purchase the Acquired Assets from Seller in exchange for the consideration described in Section 2.6 hereof.

**Section 2.2      The Acquired Assets**. Subject to the provisions of Section 2.3(g) stated herein, in this Agreement, the phrase "*Acquired Assets*" means the following assets of Seller, other than the Excluded Assets (as defined in Section 2.3):

(a)      Seller's equipment, machinery, furniture, furnishings, fixtures, office materials, and other tangible personal property used or useful in the conduct of the Business or operations of the Business (the "*Tangible Personal Property*"), together with such improvements and additions thereto and replacements thereof, and all equipment ordered and/or obtained prior to the Closing Date in connection with the "*FCC Repacking"* (as described in Section 2.11 below), between the date hereof and the Closing Date, including but not limited to those assets set forth on Schedule 2.2(a) attached hereto;

(b)      All of the licenses, permits, applications, and other authorizations, including the FCC Authorizations (collectively, the "*Licenses*"), issued by, or granted by, or filed with the FCC,  and any other federal, state or local governmental authorities, to Seller in connection with the conduct of the Business, including but not limited to those specifically set forth on Schedule 2.2(b) attached hereto;

(c)      The Seller's fee simple interest in the Twiggs County Property, including buildings, fixtures and other improvements, leasehold interests, easements, licenses, rights of access, rights of way and improvements which are held by Seller for use in the operations of the Business (the "*Real Property*"), as specifically set forth on Schedule 2.2(c) attached hereto;

(d)      The contracts and agreements listed and described on Schedule 2.2(d) hereto (collectively, the "*Assumed Contracts*");

(e)      All of Seller's logs, books, files, data, software, FCC and other governmental applications, equipment manuals and warranties, and other records relating to the full on-air broadcast operations of the Business, including without limitation all records required by the FCC to be kept by the Business;

(f)      All of Seller's right, title and interest in and to all copyrights, licenses, patents, trademarks, service marks, logos and trade names used in connection with the operation of the Business and all goodwill associated therewith, including registrations and applications for registration of any of the foregoing, and other similar intangible rights and interests; and

(g)      Any and all funds issued to Seller in connection with the FCC Repacking referenced in Section 2.11 below that have not been expended on the purchase of

equipment and services necessary to accomplish the construction and implementation of the WPGA-TV Ch. 23 Repack CP.

**Section 2.3     Excluded Assets**. The following assets and obligations relating to the Business shall be retained by Seller and shall not be sold, assigned or transferred to or assumed by Buyer (the "*Excluded Assets*"):

(a)     Except as provided in Section 2.2(g), cash on hand and in banks (or their equivalents), and accounts receivable arising out of the Seller's operation of the Business as of the Closing Date;

(b)     All rights of Seller under all contracts, leases and agreements, contracts of insurance and insurance proceeds of settlement and insurance claims made by Seller relating to property or equipment repaired, replaced, restored by Seller as of the Closing Date;

(c)     All pension, profit-sharing, retirement, stock purchase or savings plans or trusts and any assets thereof and all other employee benefit plans;

(d)     All deposits and all prepaid expenses and Taxes;

(e)     The corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(f)     Radio Perry's fee simple interest in that certain real property, including buildings, fixtures and other improvements, leasehold interests, easements, licenses, rights of access, rights of way and improvements held by Seller, as more specifically set forth on Schedule 2.3(f) (the "*Excluded Property*");

(g)     That fee simple interest in that certain real property, including buildings, fixtures and other improvements, leasehold interests, easements, licenses, rights of access, rights of way and improvements held by Seller, as more specifically set forth on Schedule 2.3(f);

(h)     Other than the Twiggs County Property, all other assets held by L.R., individually;

(i)     Any interests held by Seller in Register Digital Systems, LLC, or any assets held or owned by such entity; and

(j)     All other assets held by Seller which are not directly related to the operations of the Business, or not specifically included in the Acquired Assets defined in Section 2.2 above.

**Section 2.4     Assumed Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge the following Liabilities of the Seller (collectively, the "*Assumed Liabilities*"), and no other Liabilities of the Seller:

(a)    All Liabilities in respect to the Assumed Contracts listed in Schedule 2.2(d); and

(b)    Real Property but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warrant or other breach, default or violation by Seller on or prior to the Closing.

**Section 2.5    Excluded Liabilities**. Notwithstanding any other provision in this Agreement to the contrary, except for the Assumed Liabilities, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever (the "*Excluded Liabilities*"). Seller shall pay and satisfy in due course all Excluded Liabilities which Seller is obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)    Any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement and the transactions contemplated hereby and thereby, including, without limitations, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    Any Liabilities for Taxes of Seller, or relating to the Business, the Acquired Assets or the Assumed Liabilities, for (i) any pre-Closing tax period; (ii) Taxes that arise out of the consummation of the transactions contemplated in this Agreement; or (iii) other Taxes of Seller of any kind or description, including any Liability for Taxes of Seller that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law;

(c)    Any Liabilities relating to or arising out of the Excluded Assets;

(d)    Any Liabilities in respect to any pending or threatened Action arising out of or relating to the operation of the Business or the Acquired Assets prior to the Closing Date;

(e)    Any Liabilities relating to or arising out of any make-whole demand, any demand for indemnification, contribution or repurchase or any other demand for money, property, fees, charges, interest or assessments made by any Third-Party if such demand was made prior to the Closing Date, is based upon or related to facts, circumstances or conduct occurring prior to the Closing Date or is related to an Excluded Asset;

(f)    Any Liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

(g)    Any Liabilities of Seller to Seller's employees under any existing written or oral agreements with Seller, including any such Liability or obligation in respect of wages, salaries, bonuses, accrued vacation or sick pay or any other matter;

(h)     Any Liabilities arising out of any termination by Seller of the employment of any employee of the Business;

(i)     Any debt, loans or credit facilities to financial institutions;

(j)     Any Liabilities of the Business relating or arising from unfulfilled commitments, quotations or applications for insurance that did not arise in the ordinary course of business or are not validly and effectively assigned to Buyer pursuant to this Agreement;

(k)     Any Liabilities under any contract that: (1) are not validly assigned to Buyer; (ii) do not conform to the representations and warranties of Seller in this Agreement; or (iii) result from a breach by Seller of such contract prior to Closing; and

(l)     Any Liabilities arising out of, in respect of or in connection with the failure by any Seller or any Seller's Affiliates to comply with any Law or Governmental Order.

**Section 2.6**    **Purchase Price**. At the Closing, and upon and subject to the terms and adjustments described below, Buyer shall pay to Seller One Million Eight Hundred Thousand and NO/100 Dollars ($1,800,000.00) (the "*Purchase Price*"), and Buyer shall pay the Purchase Price to Seller by wire transfer of immediately available funds pursuant to wire instructions provided to Buyer at least three (3) days prior to the Closing Date.

**Section 2.7**    **Escrow Deposit**.

(a)     Simultaneously with the execution and delivery of this Agreement, Buyer shall deposit Two Hundred Thousand and NO/100 Dollars ($200,000.00) (the "*Escrow Amount*") into escrow. The Escrow Amount shall be held and disbursed by James-Bates-Brannan-Groover, LLP, 231 Riverside Drive, Macon, Georgia 31201 as the escrow agent (the "*Escrow Agent*") pursuant to the terms of an escrow agreement mutually agreeable to the Parties (the "*Escrow Agreement*"). At the Closing, the Escrow Amount shall be credited to the Purchase Price, and the Parties shall cause the Escrow Amount to be paid to Seller and any interest on the Escrow Amount to be paid to Buyer.

(b)     If, within forty-five (45) days from the payment of the Escrow Amount as contemplated herein (the "*Inspection Period*"), Buyer in its sole discretion determines that any of the material Acquired Assets (excluding studio equipment, furniture, furnishings, office materials) are not satisfactory, then Buyer may exclude such Assets from the transaction or terminate the transaction by giving written notice to Seller prior to the end of the Inspection Period. Upon receipt of such notice, Escrow Agent shall refund the Escrow Amount to Buyer.

**Section 2.8**    **Prorations**. Except as otherwise set forth herein, all Seller income and all items of expense arising from the operation of the Business through 11:59 p.m. on the day before the Closing Date (the "*Effective Time*") shall be for the account of Seller. All items of income and all items of expense arising from the operation of the Business on or after the Closing Date shall be for the account of the Buyer. All income and expenses shall be prorated accordingly as

of the time specified above.  For clarity, any and all funds received from the FCC for reimbursement of FCC Repacking related costs and not already expended by Seller in the direct implementation of the Repack CP as of the Effective Time above shall not be prorated but shall be delivered in full to Buyer.  All prorations shall, to the extent feasible, be determined and set forth in a writing executed by the parties hereto and paid on the Closing Date, with a final settlement thereof to be made within sixty (60) days after the Closing Date.

**Section 2.9    FCC Consent; Assignment Application**.  At a date not later than ten (10) Business Days after the execution of this Agreement, Buyer and Seller shall execute, file and vigorously prosecute applications with the FCC (the "*Assignment Applications*") requesting FCC consent to the assignment to Buyer of all FCC Authorizations pertaining to the Business (the "*FCC Consent*").  Buyer and Seller shall take all reasonable steps to cooperate with each other and with the FCC to secure such FCC Consent without delay, and to promptly consummate this Agreement in full.  Each party shall be responsible for all of its own costs with respect thereto, except that any Assignment Application FCC filing fee will be paid by Buyer.

**Section 2.10   Bankruptcy Court Approval**.  Buyer and Seller understand and agree that Radio Perry and Radio Peach have cases pending as debtors in possession, in the U. S. Bankruptcy Court, Middle District of Georgia, Macon Division, Case Nos. 16-52371 and 16-52372.  The terms of this Agreement, the submission of the Assignment Applications and the consummation of the transaction contemplated herein all are subject to the review and approval by the Court, and that such approval shall be a mutual Closing Condition in accordance with Section 6.1 herein.

**Section 2.11   FCC Repacking; Reimbursement Allocation**.  The Middle Class Tax Relief and Job Creation Act of 2012 contains provisions in Title VI – known as the Spectrum Act – which mandates a reorganization of the broadcast television band to make additional spectrum available for wireless use by requiring many television stations to change their channels. The Business is one such station. Under the Spectrum Act, the FCC is required to reimburse costs reasonably incurred by broadcast television licensees, such as Seller, that are reassigned to new channels as part of the "repacking" process. Such reimbursement is issued from the TV Broadcaster Relocation Fund. To receive such reimbursement, all eligible stations are to submit their estimated relocation costs by using FCC Form 2100, Schedule 399 ("Schedule 399"). Seller has submitted Schedule 399 with relocation costs estimated at $1,251,750.00 which has been verified by the TV Broadcaster Relocation Fund Administrator. The FCC issued a construction permit for WPGA-TV to operate on Ch.23 (the "*Repack CP*") and designated WPGA-TV to transition to its new channel during Phase 3 of the FCC Repacking.  The FCC has indicated that WPGA-TV is not in a "linked pool" (i.e., it is not required to coordinate its transition to the facilities in its Repack CP with any other station).  Currently, the Repack CP must be implemented and a license to cover the Repack CP filed with the FCC between April 13, 2019 and the final Phase 3 conversion date of June 21, 2019.  The FCC established a March 25, 2019 deadline for filing requests to extend repack construction permits for stations, like WPGA-TV, in Phase 3. With the cooperation and assistance of Seller, Buyer may resubmit or revise the previously verified cost estimate via Schedule 399 if Buyer desires to modify the equipment and/or services ordered for the purpose of channel relocation for the Business.

# ARTICLE III
# CLOSING

**Section 3.1    Closing Date; Closing Place**.  The closing (the "*Closing*") of the transactions contemplated by this Agreement shall occur at a place mutually agreeable to Buyer and Seller and on a date which is the later of: (i) ten (10) days after the FCC Consent unless a petition to deny or informal objection is filed against one or both of the Assignment Applications, in which event the Closing will occur within ten (10) days after the FCC Consent becomes a Final Order; or (ii) the Parties' satisfaction of the Conditions to Closing as set forth in Article VI of this Agreement (the "Closing Date").  A "Final Order" means a written action or order issued by the FCC, setting forth the FCC Consent (a) which has not been reversed, stayed, enjoined, set aside, annulled or suspended, and (b) with respect to which (i) no requests have been filed for administrative or judicial review, reconsideration, appeal or stay, and the time for filing any such requests and for the FCC to set aside the action on its own motion has expired, or (ii) in the event of review, reconsideration or appeal, that does not result in the FCC Consent being reversed, stayed, enjoined, set aside, annulled or suspended, and the time for further review, reconsideration or appeal has expired.

**Section 3.2    Closing Deliverables**.

      (a)    <u>Seller's Deliverables</u>.  At the Closing, Seller shall deliver to Buyer the following:

      (i)    A Bill of Sale and other instruments of transfer and conveyance to transfer and assign to Buyer good and marketable title in the Tangible Personal Property;

      (ii)    Assignment of the FCC Authorizations;

      (iii)    A Warranty Deed for each parcel of Real Property, duly executed by the respective Seller;

      (iv)    Certified copies of the resolutions of the Board of Directors of Seller authorizing and approving the execution and delivery of this Agreement and authorizing the consummation of the transactions contemplated hereby and thereby;

      (v)    A certificate of Seller certifying the fulfillment of the conditions set forth in Section 6.3 hereof;

      (vi)    A certificate of good standing for Sellers from the State of Georgia;

      (vii)    Such other documents, instruments and agreements necessary to consummate the transactions contemplated by this Agreement or as Buyer shall reasonably request, each in form and substance satisfactory to Buyer;

(viii)    Joint written instructions to the Escrow Agent for the release of the Escrow Amount and any interest accrued thereon;

(ix)    Wire instructions for the payment of the remainder of the Purchase Price as adjusted as provided in Section 2.8;

(x)    If the Repack CP has not yet been fully implemented and the license to cover filed with the FCC as of the Closing Date, Seller shall deliver any and all FCC repack funds not yet expended, with Buyer's agreement and cooperation, on equipment or services to Buyer with a full accounting;

(xi)    Updated Schedules.

(b)    <u>Buyer's Deliverables</u>.  At the Closing, Buyer shall deliver to Seller the following:

(i)    The payment of the Purchase Price;

(ii)    Countersigned Bill of Sale, Assignments of FCC Authorizations, Joint Escrow Instructions and other instruments of transfer and conveyance transferring the Acquired Assets to Buyer;

(iii)    Certified copies of the resolutions of the authorized representatives of Buyer authorizing and approving the execution and delivery of this Agreement and authorizing the consummation of the transactions contemplated hereby and thereby;

(iv)    A certificate of Buyer certifying the fulfillment of the conditions set forth in Section 6.2 hereof;

(v)    A certificate of good standing for Buyer from the Secretary of State of Georgia authorizing Buyer to do business in Georgia as a foreign entity; and

(vi)    Such other documents, instruments and agreements necessary to consummate the transactions contemplated by this Agreement or as Seller shall reasonably request, each in form and substance satisfactory to Seller and its counsel.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

**Section 4.1    Representations and Warranties of Seller**.  Seller hereby makes the following representations and warranties to Buyer, which are or will be accurate as of the Closing Date:

(a)    <u>Organization and Qualification of Seller</u>. Register, Radio Perry and Radio Peach are corporations organized, validly existing and in good standing under the Laws of the State of Georgia, and, subject to the oversight and approval of the bankruptcy court as described in para. 2.10 herein, Seller has the power and authority to execute and deliver this

Agreement and to consummate the transactions contemplated hereby.

(b)      Authority and Capacity of Seller. Subject to the terms of Section 2.10 hereof, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by Seller and no other proceedings on the part of Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable in accordance with its terms, except as may be limited by the pendency of the bankruptcy proceedings identified in Para. 2.10 hereof, or by bankruptcy, insolvency or other Laws affecting generally the enforcement of creditors' rights or the application of principles of equity.

(c)      No Conflicts; Consents. Subject to the terms of Section 2.10 hereof, the execution, delivery and performance of this Agreement by Seller will not (i) to the extent applicable to Seller, constitute a violation of or conflict with Seller's articles of incorporation, by-laws or other similar organizational documents, (ii) violate any Law, statute, rule, regulation, order, writ, injunction or decree of any federal, state or local Governmental Authority or agency and which is applicable to Seller or any of the Assets, (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever on any of the Assets, or (iv) to Seller's knowledge, require the consent or approval of any Governmental Authority, lending institution or other third party other than the FCC Consent, as referenced in Section 2.9 hereto.

(d)      Title to Tangible Personal Property. Attached hereto as Schedule 2.2(a) is a list of the Tangible Personal Property owned or leased by Seller for use in connection with the Business.  Seller owns and has, or will have on the Closing Date, good and marketable title to the Tangible Personal Property.  The assets listed in Schedule 2.2(a) hereto include all material Tangible Personal Property necessary to conduct and operate the Business as now conducted (other than those assets which are Excluded Assets). Each material item of Tangible Personal Property (i) is in good condition and repair, ordinary wear and tear excepted, (ii) has been maintained in a manner consistent with generally accepted standards of good engineering practice, and (iii) is operating in material compliance with the FCC Authorizations, rules and regulations.

(e)      FCC and Other Governmental Authorizations. Attached hereto as Schedule 2.2(b) is a true and complete list of the FCC Authorizations and all other material licenses, permits or other authorizations from governmental or regulatory authorities that are required for the lawful conduct of the Business in the manner and to the full extent it is presently operated.  Except as set forth in Schedule 2.2(b), the FCC Authorizations are in full force and effect, unimpaired by any material act or omission of Seller.  Seller lawfully holds each of the FCC Authorizations and other licenses, permits and authorizations listed on Schedule 2.2(b), none of which is subject to any restrictions or conditions that would limit in any material respect the operations of the Business.  Except as set forth in Schedule 2.2(b), Seller is operating the Business in all material respects in accordance with the FCC Authorizations, and all rules, regulations and policies of the FCC (the "*Communications Laws*").  There is not now pending or, to Seller's knowledge, threatened any action by or before the FCC to revoke, cancel, rescind,

modify or refuse to renew any of such FCC Authorizations, and Seller has not received any notice of and has no knowledge of any pending, issued or outstanding order by or before the FCC, or of any investigation, order to show cause, notice of violation, notice of forfeiture, or material complaint against either the Business or Seller. Seller has paid, or before closing will have paid, all outstanding FCC annual regulatory fees for WPGA-TV and WPGA-LP and any other payment obligation to the FCC (FCC regulatory fees due later in 2019 will be prorated based on the annual regulatory fees designated for WPGA-TV and WPGA-LP in 2018.) WPGA-TV is on the air operating in material compliance with the terms of its existing license. WPGA-LP is currently silent pursuant to an FCC approved Special Temporary Authority ("*STA*") to remain silent which expires on June 19, 2019. WPGA-LP went silent on September 1, 2018. At no time has either station been silent for more than twelve consecutive months.

(f)        FCC Repacking and Reimbursement. Seller has properly filed with the FCC its Schedule 399 and has updated it, as necessary, to submit true, correct and accurate invoices for reimbursement by the FCC for services and equipment required to implement and construct the repack facilities designated in the Repack CP. Schedule 4.1(f) is a full, complete, true and accurate copy of Seller's Schedule 399, all supplements or resubmissions, all attachments uploaded to the Schedule 399 (including estimates and actual invoices), copies of all FCC invoice approvals, a list of each payment approved by the FCC and the amounts, an accounting of every payment received from the FCC regarding the FCC Repacking, a complete showing of (i) what equipment or service has been ordered and received by Seller, proof of the amount actually paid for such equipment or service by Seller, whether (and how much) any payment to the relevant vendor for such equipment or service is outstanding, and whether FCC funds have been received for such equipment or service (and how much); (ii) what equipment has been ordered by Seller but not yet received, the amount actually paid for such equipment or service, the schedule for delivery of such equipment or service, whether any payment is outstanding (and how much) to the relevant vendor for such equipment or service, and whether FCC funds have been received (and how much) for such equipment or service; (iii) what equipment or services necessary to implement the Repack CP have not been ordered; (iv) a specific indication of any equipment or services for which invoices have not yet been submitted to the FCC; (v) a list of invoices that have been submitted to the FCC but for which the FCC has not yet approved or delivered payment; (vi) the date scheduled for tower work and any other scheduled work related to the Repack CP.

(g)        Title to Real Property; Leased Property. Schedule 2.2(c) attached hereto contains a complete legal description of the Real Property in connection with the Seller's operation of the Business. Except as set forth on Schedule 2.2(c), the Real Property and improvements constructed thereon, as well as the present uses thereof, conform in all material respects with all restrictive covenants and with all applicable zoning, environmental and building codes, Laws, rules and regulations, including set back restrictions. To Seller's knowledge, there is no pending condemnation or similar proceeding affecting the Real Property or any portion thereof, except as set forth in Schedule 4.1(h), and no such action is presently contemplated or threatened.

(h)        Brokers. Other than the contractual arrangement between Seller and Heritage Capital Group, Inc., there is no broker or finder or other Person who would have any valid claim against Seller for a commission or brokerage in connection with this Agreement

or the transaction contemplated hereby as a result of any agreement, understanding or action by Seller.

(i)    <u>Legal Proceedings; Orders</u>. Except as provided in Section 2.10 and as set forth in <u>Schedule 4.1(h)</u>, there is no material litigation pending against or, to Seller's knowledge, threatened against Seller which relates to Seller or the Business or could affect any of the Assets.  Seller, with respect to the Business, has complied in all material respects with all applicable Laws, regulations, orders or decrees.  The present operation by Seller of the Business does not violate any such Laws, regulations, orders or decrees in any material respect.   With respect to the litigation identified in Schedule 4.1 attached hereto, Seller represents and warrants that no interest party therein shall have a claim, or unasserted claim or judgment having any adverse effect on the transactions contemplated hereby or on Buyer's use and enjoyment of the Acquired Assets after the Closing.

(j)    <u>Compliance with Environmental Laws</u>. To Seller's knowledge, the Real Property is in material compliance with all applicable Laws, statutes, rules, regulations, codes and ordinances of all U.S. federal, state and local government agencies and authorities relating to the discharge of air pollutants, water pollutants or process waste water, Hazardous Materials (as defined herein), or toxic substances, or otherwise relating to the environment, including without limitation the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, regulations of the Environmental Protection Agency, and regulations of any state department of natural resources or state environmental protection agency ("*Environmental Laws*").  As used herein, the term "*Hazardous Materials*" means any wastes, substances, or materials (whether solids, liquids or gases) that are deemed hazardous, toxic, pollutants, or contaminants, including substances defined as "hazardous wastes," "hazardous substances," "toxic substances," "radioactive materials," or other similar designations in, or otherwise subject to regulation under, any Environmental Laws.

**Section 4.2    Representations and Warranties of Buyer**.  Buyer hereby makes the following representations and warranties to Seller:

(a)    <u>Organization and Qualification of Buyer</u>. Buyer is a Limited Liability Company duly organized, validly existing and in good standing under the Laws of the State of Idaho, and is, or as of the Closing Date will be, qualified to do business in the State of Georgia.

(b)    <u>Authority and Capacity of Buyer</u>. Buyer has the power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes the legal, valid and binding agreements of Buyer, enforceable in accordance with its respective terms.

(c)      No Conflicts; Consents. The execution, delivery and performance of this Agreement by Buyer will not (i) conflict with or result in any breach of any provision of the articles of organization, operating agreement or other similar organizational documents of Buyer, or (ii) result in a default (or give rise to any right of termination, cancellation or acceleration) under or conflict with any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation, relating to its own business, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained and delivered to Seller, (iii) violate any Law, statute, rule, regulation, order, writ, injunction or decree of any federal, state or local Governmental Authority or agency and which is applicable to Buyer, or (iv) require the consent or approval of any Governmental Authority other than the FCC Consent.

(d)      FCC Qualification. Buyer is legally, technically and financially qualified to acquire and become the FCC licensee of the Business and to perform its obligations under this Agreement.

(e)      Legal Proceeding; Governmental Investigation. There is no litigation, proceeding or governmental investigation pending or to the knowledge of Buyer, threatened, in any court, arbitration board, administrative agency, or tribunal against or relating to Buyer, including without limitation any voluntary or involuntary petition under Federal bankruptcy Law or any state receivership or similar proceedings, that would prevent or materially impede the consummation by Buyer of the transactions contemplated by this Agreement, nor does Buyer know of, or have any reasonable ground to know of, in view of its present situation or action it now contemplates taking, any basis for such litigation, proceeding or investigation.

(f)      Brokers.  Hadden & Associates are entitled to receive from Buyer a commission of $50,000 upon the consummation of the transaction herein.  Aside from this, there is no broker or finder or other Person who would have any valid claim against Buyer for a commission or brokerage fee in connection with this Agreement or the transactions contemplated hereby as a result of any agreement, understanding or action by Buyer.

(g)      Sufficiency of Funds. Buyer has sufficient cash on hand and liquid assets to enable it to make payment of the Purchase Price and consummate the transaction contemplated by this Agreement. Within ten (10) business days of the date hereof and upon request by Seller, Buyer shall provide evidence of such sufficient funds to consummate the transaction contemplated herein. Failure of Buyer to provide such evidence upon the reasonable request by Seller within such time period shall permit Seller to terminate this Agreement in accordance with the terms of Section 8.1 herein.

## ARTICLE V
## COVENANTS

**Section 5.1    Conduct of Business Prior to the Closing**.  Seller shall continue to operate and maintain the Business in accordance with the terms of the FCC Authorizations and

in material compliance with all applicable Laws and FCC rules and regulations. Seller will deliver to Buyer, promptly after filing, copies of any reports and applications filed with the FCC related to the Business, including but not limited to, all Schedule 399 submissions, emails or other correspondence from the FCC's Relocation Fund Administrator or any FCC personnel or FCC contractor related to the FCC Repacking and all notices of payments received from the FCC Relocation Fund which are filed or received between the date of this Agreement and the Closing Date. Seller shall take all actions necessary to keep the FCC Authorizations, including all material permits and applications pending before the FCC, valid and in full force and effect.

**Section 5.2     Coordination with Buyer on FCC Repacking**. Between the date of this Agreement and the Closing Date, Seller shall fully and completely cooperate and coordinate with Buyer related to the FCC Repacking, the submission of invoices to the Schedule 399, the ordering, delivery and implementation of equipment and services related to the construction and implementation of the Repack CP and shall concurrently provide copies of same to Buyer.

**Section 5.3     Request for Extension of Repack CP**. Given the short time frame for construction and implementation of the Repack CP and the time necessary to file and obtain FCC Consent to the Assignment Applications, Seller, with the cooperation of Buyer, will submit to the FCC prior to the March 25, 2019 FCC deadline a request for extension of the Repack CP to ensure that sufficient time exists for Seller and/or Buyer to implement the Repack CP.

**Section 5.4     FCC Repacking Transition Reports, Viewer, MVPD and Medical Notifications**. Seller, with notice to and the cooperation of Buyer, will timely file complete and accurate transition progress reports as required by the FCC between the date hereof and the Closing Date (including on April 12, 2019 (10-weeks in advance of final transition date) and five (5) days before termination of operation on the pre-auction channel) and shall provide copies of all such submission to Buyer concurrently with such filing. In addition, Seller shall send the required MVPD notifications by March 23, 2019, and if Closing has not yet occurred, begin the required viewer notices on May 22, 2019 and upload the required viewer notification certification to the Auction Transition Consumer Certificate in the WPGA-TV online public file, make the required medical notification before June 21, 2019, and file a license to cover the Repack CP on or before June 21, 2019. Seller shall update and deliver updated Schedule 4.1(f) to Buyer as changes occur.

**Section 5.5     Access to Information**. From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Real Property, Assets, premises, books and records, contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business.

**Section 5.6     Insurance**. Seller shall maintain in full force and effect through the Closing Date adequate property damage, liability and other insurance with respect to the Assets.

**Section 5.7     No Opposition**. Seller shall not take any action or file any pleading with

the FCC to oppose either of the Assignment Applications or prevent the grant of either of the FCC Consents and Seller shall ensure that no such action is taken by any principal, shareholder, officer, director or affiliate of Seller or any principal, shareholder, member, officer, director of any Seller affiliate.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.1     Conditions to Obligations of All Parties**. The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transaction contemplated hereunder to be rescinded following completion thereof; and

(b)     Buyer shall have received all consents, authorizations, orders and approvals required by applicable Law or a Governmental Authority, including, but not limited to, the review and approval by the U. S. Bankruptcy Court, Middle District of Georgia, Macon Division of this Agreement as provided for in Section 2.10 hereof and the FCC.

**Section 6.2     Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to Closing, of each of the following:

(a)     Buyer shall have performed and complied in all material respects with all of the agreements, obligations and covenants required by this Agreement to be performed or complied with by Buyer prior to or as of the Closing Date;

(b)     The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date;

(c)     The FCC Consent shall have been issued;

(d)     Buyer shall have delivered to Seller, on the Closing Date, the documents required to be delivered pursuant to Section 3.2(b);

(e)     Buyer shall not be subject to any voluntary or involuntary petition under Federal bankruptcy Law, or any state receivership or similarly proceeding; and

(f)     If any event should occur which would prevent the consummation of the transactions contemplated hereunder, the Buyer, as appropriate, shall use its best efforts to cure the event as expeditiously as possible.

**Section 6.3     Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to Closing, of each of the following:

(a)     Seller shall have performed and complied in all material respects with all the agreements, obligations and covenants required by this Agreement to be performed or complied with by Seller prior to or as of the Closing Date;

(b)     The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date;

(c)     The FCC Authorizations, including the Repack CP, the Displacement CP and the WPGA-LP silent STA, shall all be valid and in good standing;

(d)     The request for extension of the Repack CP shall have been timely filed with the FCC and the FCC shall have granted such extension for a period of at least 6 months.  If the extension is not granted and, in any event subject to prior FCC Consent and, if applicable, a Final Order, Buyer shall not be obligated to Close until Seller has filed a license to cover the Repack CP.

(e)     If the extension of the Repack CP is not granted, the Seller shall complete implementation of the Repack CP pursuant to its current terms (including making all required viewer, medical and MVPD notifications, filing all required transition progress reports and filing a license to cover the Repack CP during the Phase 3 window (April 13, 2019 and June 21, 2019).

(f)     If the Repack CP has not been fully implemented and the license to cover filed before Closing, then Seller has delivered all FCC repack funds not paid out to a vendor specifically for repack equipment or services, to Buyer for use in implementing the Repack CP.

(g)     The FCC Consent shall have been issued, and if a petition to deny or informal objections was filed against one or both Assignment Applications, the FCC Consent shall have become a Final Order;

(h)     There shall not be any Liens on the Assets or any financing statements of record other than those to be satisfied by Seller on or before the Closing Date;

(i)     Notwithstanding the terms of Section 2.10 and except as set forth in Schedule 4.1(h) hereof, no suit, action, claim or governmental proceeding shall be pending, and no order, decree or judgment of any court, agency or other Governmental Authority shall

have been rendered against any party hereto which would render it unlawful, as of the Closing Date, to effect the transactions contemplated by this Agreement in accordance with its terms; and

(j)      Seller shall have delivered to Buyer, on the Closing Date, the documents required to be delivered pursuant to Section 3.2(a); and

(k)      If any event should occur which would prevent the consummation of the transactions contemplated hereunder, Seller, as appropriate, shall use its best efforts to cure the event as expeditiously as possible.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.1      Indemnification by Seller**. Following the Closing, Seller shall indemnify, defend and hold harmless Buyer with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including, without limitation, interest, penalties, court costs and reasonable attorneys' fees) (collectively, "*Damages*") asserted against, resulting from, imposed upon or incurred by Buyer directly or indirectly relating to or arising out of:  (i) the breach by Seller of any of its representations or warranties that survive the Closing, or failure by Seller to perform any of its covenants, conditions or agreements set forth in this Agreement that survive the Closing; and (ii) any and all claims, liabilities and obligations of any nature, absolute or contingent, relating to the ownership and operation of the Business prior to the Closing, including the Excluded Liabilities and with respect to the Excluded Assets.

**Section 7.2      Indemnification by Buyer**. Following the Closing, Buyer shall indemnify, defend and hold harmless Seller with respect to any and all Damages asserted against, resulting from, imposed upon or incurred by Seller directly or indirectly relating to or arising out of:  (i) the breach by Buyer of any of its representations, warranties, or failure by Buyer to perform any of its covenants, conditions or agreements set forth in this Agreement; and (ii) any and all claims, liabilities and obligations of any nature, absolute or contingent, relating to the Assets, Assumed Liabilities or ownership and operation of the Business as conducted by Buyer subsequent to the Closing.

**Section 7.3      Indemnification Procedures**.

()a  If either party hereto (the "*Indemnitee*") receives notice or otherwise obtains knowledge of any matter with respect to which another party hereto (the "*Indemnifying Party*") may be obligated to indemnify the Indemnitee under this Article VII then the Indemnitee shall promptly deliver to the Indemnifying Party written notice describing such matter in reasonable detail and specifying the estimated amount of the Damages or liability that may be incurred by the Indemnitee in connection therewith.

()b  The Indemnifying Party shall have the right, at its option, to assume the complete defense of such matter at its own expense and with its own counsel, provided such counsel is reasonably satisfactory to the Indemnitee.  If the Indemnifying Party elects to assume

the defense of such matter, then (i) notwithstanding anything to the contrary herein contained, the Indemnifying Party shall not be required to pay or otherwise indemnify the Indemnitee against any such matter following the Indemnifying Party's election to assume the defense of such matter, (ii) the Indemnitee shall fully cooperate as reasonably requested by the Indemnifying Party in the defense or settlement of such matter, (iii) the Indemnifying Party shall keep the Indemnitee informed of all material developments and events relating to such matter, and (iv) the Indemnitee shall have the right to participate, at its own expense, in the defense of such matter.  In no event shall the Indemnifying Party be liable for any settlement or admission of liability with respect to such matter without its prior written consent.

Section 7.4    **Survival**. The several representations and warranties of Seller and Buyer contained in or made pursuant to this Agreement shall expire on the date that is one (1) year after the Closing Date.

## ARTICLE VIII
## TERMINATION

Section 8.1    **Termination**. Either Buyer or Seller may terminate this Agreement, if the party seeking to terminate is not in default or breach of any of its material obligations under this Agreement, upon written notice to the other upon the occurrence of any of the following: (a) if, on or prior to the Closing Date, the other party breaches any of its material obligations contained herein, and such breach is not cured by the earlier of the Closing Date or thirty (30) days after receipt of the notice of breach from the non-breaching party; or (b) if the Assignment Applications are denied or designated for hearing, and such denial or designation is no longer subject to administrative or judicial review; or (c) if there shall be in effect any judgment, final decree or order that would prevent or make unlawful the Closing of this Agreement.

Section 8.2    **Equitable Remedies; Specific Performance**. Each party to this Agreement acknowledges and agrees that (a) a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other party for which monetary damages would not be an adequate remedy and (b) if a breach or a threatened breach by such party of any such obligations occurs, the other party hereto will, in addition to any and all other rights and remedies that may be available to such party at Law, at equity or otherwise in respect of such breach, be entitled to equitable relief, including but not limited to specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to (i) post a bond or other security, or (ii) prove actual damages or that monetary damages will not afford an adequate remedy. Each party to this Agreement agrees that such party shall not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this Section 8.2.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    **Confidentiality**. Each party shall treat as confidential any information of another party obtained through this transaction, unless such information is or becomes generally

available to the public other than as a result of disclosure by the party which alleges the information is confidential, or unless such information is legally compelled to be disclosed.

**Section 9.2     Notices**.  All notices, elections and other communications permitted or required under this Agreement shall be in writing and shall be deemed effectively given or delivered upon personal delivery (or refusal thereof), or twenty-four (24) hours after delivery to a courier service which guarantees overnight delivery, and, in the case of courier or mail delivery, addressed as follows (or at such other address for a party as shall be specified by like notice):

If to Seller, to:

Register Communications, Inc.
1691 Forsyth Street
Macon, GA  31201
Fax: 478-745-5800
Attention: Lowell L. Register

With a copy (which shall not
constitute notice) to:

James Bates Brannan Groover, LLP
231 Riverside Drive
Macon, GA 31201
Fax: 478-742-8720
Attention: Hays B. McQueen

Heritage Capital Group, Inc.
4417 Beach Boulevard, Suite 302
Jacksonville, FL 32207
Fax:  904-354-6696
Attention: Dan Edelman

If to Buyer, to:

Ventura Media Communications LLC
        Attn. Mark Shirin
3619 E. Ventura Avenue
Fresno, CA 93702

With a copy (which shall not
constitute notice) to:

Michael Couzens
Attorney at Law
6536 Telegraph Avenue, Suite B201
Oakland, CA 94609

**Section 9.3    Governing Law**.  This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia, without giving effect to the choice of law principles thereof.

**Section 9.4    Partial Invalidity**.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any provision contained herein shall, for any reason, be held to be invalid or unenforceable, such provision shall be ineffective to the extent of such invalidity or unenforceability without invalidating the remainder of such provision or any other provisions hereof.

**Section 9.5    Counterparts**.  This Agreement may be executed in several counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument. This Agreement may be executed and exchanged by electronic mail or facsimile transmission, with the same legal effect as if the signatures had appeared in original handwriting on the same physical document. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.

**Section 9.6    Expenses**.  Seller shall be solely responsible for any expense in obtaining the approval of the U.S. Bankruptcy Court to the transactions contemplated hereby.  Otherwise and unless expressly provided herein, Buyer and Seller shall be solely responsible for all costs and expenses incurred by them in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement.  All federal, state, local and other transfer and sales taxes, if any, applicable to, imposed upon or arising out of the transfer to Buyer of the Acquired Assets as contemplated hereby shall be paid according to local custom.

**Section 9.7    Assignment**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No party may voluntarily or involuntarily assign its interest or delegate its duties under this Agreement without the prior written consent of the other party.

**Section 9.8    Third-Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.9    Entire Agreement**.  This Agreement, and the exhibits and schedules attached hereto, supersede all prior agreements and understandings between the parties with respect to the subject matter hereof, and no attempted change, amendment, or waiver of any of the provisions hereof shall be binding unless in writing and signed by both Buyer and Seller.

**Section 9.10   Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be

construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**<u>Seller:</u>**

**REGISTER COMMUNICATIONS, INC.**

By:   _____[SEAL]
　　　Name: Lowell L. Register

　　　Title: C.E.O.

**RADIO PERRY, INC.**

By:   _____[SEAL]
　　　Name: Lowell L. Register

　　　Title: C.E.O.

**RADIO PEACH, INC.**

By:   _____[SEAL]
　　　Name: Lowell L. Register

　　　Title: C.E.O.

**LOWELL L. REGISTER**

By:   _____
　　　Individually

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

      IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**<u>Buyer:</u>**

**VENTURA MEDIA COMMUNICATIONS LLC**

By: _____

Name:

Title:

**LIST OF SCHEDULES**

Schedule 1:            Definitions

Schedule 2.2(a):       Tangible Personal Property

Schedule 2.2(b):       FCC Authorizations

Schedule 2.2(c):       Real Property

Schedule 2.2(d):       Assumed Contracts

Schedule 2.3 (f):      Excluded Property

Schedule 2.4:          Assumed Liabilities

Schedule 4.1(f)        FCC Repacking Matters

Schedule 4.1(h):       Legal Proceedings

## SCHEDULE 1

## Definitions

For the purposes of this Agreement, the following terms shall be defined as below, except as otherwise defined in this Agreement:

"Agreement" means this Asset Purchase Agreement as it may periodically be amended, restated, or supplemented in accordance with its terms.

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Business" has the meaning given that term in the Background.

"Business Day" means any day other than Saturday, Sunday, or any day on which banking institutions in Atlanta, Georgia are closed either under applicable Law or action of any Governmental Authority.

"Governmental Authority" means any (a) nation, region, state, county, city, town, village, district or other governmental jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) department, agency or instrumentality of a foreign or other government, including any state-owned or state controlled instrumentality of a foreign or other government, (d) governmental or quasi-governmental authority of any nature (including any governmental agency, branch or department and any court or other governmental tribunal), or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"Person" means an individual or an entity, including a corporation, limited liability company, partnership, trust, unincorporated organization, association or other business or investment entity, or any Governmental Authority.

"Representative" means with respect to a specified Person, any directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of that specified Person.

"Tax" means (a) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, real estate transfer, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including taxes under Section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority, (b) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute.

"Tax Return" means any report, return, filing, declaration, claim for refund, or information return or statement related to Taxes required to be filed with a Governmental Authority, including any schedule or attachment thereto, and including any amendment of any of them.

SCHEDULE 2.2(a)

Tangible Personal Property

WPGA-TV Studio Inventory

| | | |
|---|---|---|
| 1 Tandberg E5780 encoder | 5 Various tripods | 6 Grass/Adrienne switchers |
| 1 Tandberg E5710 encoder | 1 Grass Valley Prod. Switcher | 1 Patriot satellite antenna |
| 1 Sony 55-inch tv receiver | 1 Mackie 1642-VLZ mixer | 1 Andrew fixed satellite dish |
| 1 Avaya Partner phone system | 1 Mackie 1202 mixer | 1 Andrew movable sat dish |
| 38 Avaya 18D telephones | 1 Leitch P-8X8HS switcher | 2 Andrew sat positioner |
| 1 Lenovo computer | 1 Panasonic AJ-D250 recorder | 2 Leitch VCD3200E decoders |
| 2 Panasonic DVX100B cameras | 1 Panasonic AJ-D450 recorder | 2 Unity 4422 sat receivers |
| 4 Tandberg TT1260 receivers | 1 Tandberg TT4030 monitor | 1 Link 1E833 sync generator |
| 4 Tandberg RX1290 receivers | 1 Evertz HD9625 logo inserter | 1 Sage receiver |
| 1 Tiernan TDR6 receiver | 1 Evertz XHD9504 switcher | 1 Sage encoder/decoder |
| 4 Scopus 2980 receivers | 1 Symetrix audio compressor | 1 Tandberg TT6120 processor |
| 1 MRC Analog STL transmitter | 1 Videotek VTM300 monitor | 1 Evertz 7701 d/a decoder |
| 6 CyberPower 1500w UPS | 1 ACT-T8 bal/unbal adapter | 1 Moseley MRC1600 control |
| 4 Netgear ethernet switches | 1 Masterplay automation sys. | 4 Kramer VS601 a/v switchers |
| 2 Wohler AMP1 audio da | 1 Marti CR10 RPU receiver | 4 Kramer a/v dist. Amps |
| 1 MRC TwinStream STL tx. | 3 Panasonic AJD2xx cameras | 1 Sony UVW12800 recorder |
| 1 Tandberg E5821 encoder | 2 Passive 5ghz Microwave Repeaters | |

WPGA Transmitter Inventory        [ADD REPACK EQUIPMENT OBTAINED]

ATS 25kw atsc transmitter

Axcera 1kw atsc transmitter

MRC TwinStream STL rx

Dielectric ch 32 antenna

Dielectric trans. line

SCHEDULE 2.2(b)

Licenses and Permits

1. WPGA-TV FCC License, including all digital channels, and its post-auction Construction Permit (LMS 0000028377, expiration 6/21/2019) for operation on Ch. 23 (the "*Repack CP*"); Facility ID No. 54728

2. Fixed Earth Station Registration –No. E060059 for Radio Perry, Inc. for Facility ID No. 54728

3. Auxiliary FCC License, Call Sign WMV676, for Facility ID No. 54728

4. Auxiliary FCC License, Call Sign WPVX957, for Facility ID No. 54728

5. WPGA-LP FCC License, displacement Construction Permit (LMS 0000053605,expiration 7/13/2021) for operation on Ch. 18 (the "*Displacement CP*"), and Silent STA (expiration 6/19/19); Facility ID No. 67972

6. Antenna Structure Registration: 1019967

<u>SCHEDULE 2.2(c)</u>

<u>Real Property</u>

1.  Twiggs County Property

All that certain tract or parcel of land situate, lying and being in Land Lot 121 of the 26th Land District of Twiggs County, Georgia, containing 27.24 acres more particularly described as Tract "1B" according to a plat for Martha Eloise Bond by James A. Gordon, Jr., Georgia Registered Land Surveyor, dated January 26, 1982, recorded in Plat Book 10, page 46, Clerk's Office, Twiggs Superior Court, which plat is incorporated herein by reference.

All those tracts or parcels of  land situate, lying and being in Land Lot 121 of the 28th Land District of Twiggs County, Georgia, and being known and designated as Tract "1C-1", comprising 2.242 acres and Tract "1C-2", comprising 1.190 acres, as is more particularly shown on a plat designated "Survey for Lowell L. Register" prepared by Richard L. Jones, Georgia Registered Land Surveyor, on March 16, 1994, a copy of said plat being of record in Plat Book 10, page 74, Clerk's Office, Twiggs Superior Court. Said plat and the recorded copy thereof are hereby made a part of this description by reference thereto.

SCHEDULE 2.2(d)

Assumed Contracts

1.  That certain Tower and Building Lease Agreement by and between Radio Perry, Inc. and Verizon Wireless of the East LP (as successor-in-interest to Macon Cellular Telephone Systems Limited Partnership by CEI Communications Inc.), dated as of July 1, 1999, as amended, referenced as Contract No. 40391.

SCHEDULE 2.3(f)

Excluded Property

1. Houston County Property

That certain tract or parcel of land situate, tying and being In the City of Perry, Houston County, Georgia, comprising 6.17 acres of land, being portions of Land Lots 274 arid 275 In the le' Land District, and more particularly described an follows:

BEGINNING at a point on the easterly right of way of U.S. Highway #41, which said point is 594.6 feet from the point where the south land lot line of Land Lot 274 intersects the easterly right of way line of U.S. Highway #41; thence running South 49 degrees 13 minutes East a distance of 150 feet; thence running South 43 degrees 35 minutes West a distance of 404 feet; thence running South 49 degrees 13 minutes East a distance of 504 feet; thence running North 43 degrees 35 minutes East a distance of 504 feel; thence running North 49degrees 13 minutes West a distance of 554 feet to the easterly right of way line of U.S. Highway #41; thence running along the right of way of U.S. Highway #41 South 43 degrees 35 minutes West a distance of 100 feet to the point of beginning. Said tract of land having such shapes, metes, bounds, courses end distances as are shown on copy of plat of survey of same made by Milton Beckham, Registered Surveyor No. 1031, on June 12, 1956, a copy of said plat being of record in Map Book 4, page 131, Clerk's Office, Houston Superior Court, Said plat and the recorded copy thereof are hereby made a part of this description by reference thereto.

2. The Forsyth Street Property

All that tract or parcel of land situate, lying and being in Bibb County, Georgia, in the City of Macon, being known and distinguished as Lot No. 1, Lot No. 2, Lot No. 3 and Lot No, 4 of the Virgin Property as shown by a plat of said property recorded in Book AJ, Page 694, Clerk's Office, Bibb Superior Court, which said plat is by this reference thereto incorporated herein for the purpose of a more particular and accurate description of said Lot No. 1, Lot No. 2, Lot No. 3 and Lot No. 4 hereby conveyed,

Said Lot No. 1, Lot No. 2, Lot No. 3 and Lot No. 4 of the Virgin Property are collectively designated as Tract "F" containing 0.64 acres, more particularly described according to a plat entitled "Resubdivision Survey for Fickling and Walker" prepared by Tribble & Richardson, Inc. on June 21, 1991, a copy of which is of record in Plat Book 87, page 117, Clerk's Office, Bibb Superior Court, with said Tract "F" being more particularly described as follows: BEGINNING at a point where the northeasterly right of way line Forsyth Street intersects with the northwesterly line of Franks Alley and running thence north 48 degrees 38 minutes 19 seconds west along the right of way of Forsyth Street for a distance of 199.66 feet to an iron pin located at the northeasterly right of way of Forsyth Street and the southeasterly right of way of Professional Drive; run thence along the right of way of Professional Drive north 35 degrees 01 minutes 34 seconds east for a distance of 135.86 feet to an iron pin; rut thence south 51 degrees 15 minutes 45 seconds east for a distance of 109.13 feet to an iron pin located on the northwesterly right of way of Franks Lane; run thence along the right of way of Franks Lane south 35 degrees 08 minutes 02 seconds west for a distance of 145.00 feet to an iron pin located at the POINT OF BEGINNING.

There are improvements located thereon known under the present system of numbering as 1691 Forsyth Street, Macon, Georgia.

The property hereinabove described and conveyed is the same identical property conveyed to Obi Okehi by Bibb County Physicians, Inc. by warranty deed dated November 14, 1988 and recorded in Deed Book 1736, page 528, Clerk's Office, Bibb Superior Court.

ALSO, all that tract or parcel of land situate, lying and being in Bibb County, Georgia, in the City of Macon, being an EASEMENT in and to Tract "E" more particularly described according to a plat entitled "Resubdivision Survey for Fickling and Walker" prepared by Tribble & Richardson, Inc. on June 21, 1991, a copy of which is of record in Plat Book 87, page 117, Clerk's Office, Bibb Superior Court, which said EASEMENT, among other things, grants a

perpetual nonexclusive easement for access and vehicular parking in Tract "E" for the benefit of Tract "F" hereinabove first described, said EASEMENT being created by an instrument between Fickling & Walker Co. and Dr. Obi Okehi dated July 8, 1991 and recorded in Deed Book 2013, page 238, Clerk's Office, Bibb Superior Court, which said instrument, is by this reference thereto incorporated herein for the purpose of a more particular and accurate description of both the dominant and servient estates.

SCHEDULE 4.1(h)

Legal Proceedings

| | | |
|---|---|---|
| 1. | IN RE: REGISTER COMMUNICATIONS, INC. | CASE NO.: 15-52823-AEC |
| 2. | GREEN BULL GEORGIA PARTNERS, LLC, vs. REGISTER COMMUNICATIONS, INC | CONTESTED MATTER |
| 3. | IN RE: LOWELL L. RIGISTER, SR. and JANICE J. REGISTER. | CASE NO. 17-51445-AEC |
| 4. | GREEN BULL GEORGIA PARTNERS, LLC, vs. LOWELL L. REGISTER, SR., and JANICE J. REGISTER. | CONTESTED MATTER |
| 5. | IN RE: RADIO PEACH, INC. | CASE NO. 16-52372-AEC |
| 6. | IN RE: RADIO PERRY, INC. | CASE NO. 16-52371-AEC |